UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

DOUGLAS GORDON COOK,                  ) Case No. CV 13-7704-JPR
                                       )
                Plaintiff,             )
                                       )
        vs.                            ) **MEMORANDUM OPINION AND ORDER**
                                       ) **AFFIRMING COMMISSIONER**
CAROLYN W. COLVIN, Acting              )
Commissioner of Social                 )
Security,                              )
                                       )
                Defendant.             )
_____ )

**I.    PROCEEDINGS**

        Plaintiff seeks review of the Commissioner's final decision
denying his application for Social Security disability insurance
benefits ("DIB").  The parties consented to the jurisdiction of
the undersigned U.S. Magistrate Judge under 28 U.S.C. § 636(c).
This matter is before the Court on the parties' Joint
Stipulation, filed July 18, 2014, which the Court has taken under
submission without oral argument.  For the reasons stated below,
the Commissioner's decision is affirmed.

1

**II.   BACKGROUND**

Plaintiff was born on June 1, 1955.  (Administrative Record ("AR") 195.)  He completed high school (AR 215), and he worked as a personal assistant and property manager (AR 210).

On October 1, 2009, Plaintiff submitted an application for DIB, alleging that he had been unable to work since February 9, 2006, because of "[l]ow functioning heart that was moved and crushed, Partially paralyzed on left side, Two broken vertebraes vertically, Four ribs/sternum, punctured lung."  (AR 195, 209.) After his application was denied initially and on reconsideration, he requested a hearing before an Administrative Law Judge.  (AR 140-41.)  A hearing was held on July 30, 2012, at which Plaintiff, who was represented by counsel, testified, as did a vocational expert.  (AR 84-122.)  In a written decision issued August 10, 2012, the ALJ found Plaintiff not disabled. (AR 19-27.)  On August 22, 2013, the Appeals Council denied Plaintiff's request for review.  (AR 1.)  This action followed.

**III. STANDARD OF REVIEW**

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits.  The ALJ's findings and decision should be upheld if they are free of legal error and supported by substantial evidence based on the record as a whole. See id.; Richardson v. Perales, 402 U.S. 389, 401 (1971); Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007).  Substantial evidence means such evidence as a reasonable person might accept as adequate to support a conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir. 2007). It is more than a scintilla but less than a preponderance.

1  <u>Lingenfelter</u>, 504 F.3d at 1035 (citing <u>Robbins v. Soc. Sec.</u>
2  <u>Admin.</u>, 466 F.3d 880, 882 (9th Cir. 2006)).   To determine whether
3  substantial evidence supports a finding, the reviewing court
4  "must review the administrative record as a whole, weighing both
5  the evidence that supports and the evidence that detracts from
6  the Commissioner's conclusion."   <u>Reddick v. Chater</u>, 157 F.3d 715,
7  720 (9th Cir. 1996).   "If the evidence can reasonably support
8  either affirming or reversing," the reviewing court "may not
9  substitute its judgment" for that of the Commissioner.   <u>Id.</u> at
10 720-21.

11 **IV.   THE EVALUATION OF DISABILITY**

12      People are "disabled" for purposes of receiving Social
13 Security benefits if they are unable to engage in any substantial
14 gainful activity owing to a physical or mental impairment that is
15 expected to result in death or which has lasted, or is expected
16 to last, for a continuous period of at least 12 months.   42
17 U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257
18 (9th Cir. 1992).

19      A.   <u>The Five-Step Evaluation Process</u>

20      An ALJ follows a five-step sequential evaluation process to
21 assess whether someone is disabled.   20 C.F.R. § 404.1520(a)(4);
22 <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir. 1995) (as
23 amended Apr. 9, 1996).   In the first step, the Commissioner must
24 determine whether the claimant is currently engaged in
25 substantial gainful activity; if so, the claimant is not disabled
26 and the claim must be denied.   § 404.1520(a)(4)(i).   If the
27 claimant is not engaged in substantial gainful activity, the
28 second step requires the Commissioner to determine whether the

3

claimant has a "severe" impairment or combination of impairments
significantly limiting his ability to do basic work activities;
if not, a finding of not disabled is made and the claim must be
denied. § 404.1520(a)(4)(ii). If the claimant has a "severe"
impairment or combination of impairments, the third step requires
the Commissioner to determine whether the impairment or
combination of impairments meets or equals an impairment in the
Listing of Impairments ("Listing") set forth at 20 C.F.R., Part
404, Subpart P, Appendix 1; if so, disability is conclusively
presumed and benefits are awarded. § 404.1520(a)(4)(iii).

If the claimant's impairment or combination of impairments
does not meet or equal one in the Listing, the fourth step
requires the Commissioner to determine whether the claimant has
sufficient residual functional capacity ("RFC")[1] to perform his
past work; if so, he is not disabled and the claim must be
denied. § 404.1520(a)(4)(iv). The claimant has the burden of
proving he is unable to perform past relevant work. <u>Drouin</u>, 966
F.2d at 1257. If the claimant meets that burden, a prima facie
case of disability is established. <u>Id.</u> If that happens or if
the claimant has no past relevant work, the Commissioner bears
the burden of establishing that the claimant is not disabled
because he can perform other substantial gainful work available
in the national economy. § 404.1520(a)(4)(v). That
determination comprises the fifth and final step in the
sequential analysis. § 404.1520; <u>Lester</u>, 81 F.3d at 828 n.5;

---

[1] RFC is what a claimant can do despite existing exertional
and nonexertional limitations. § 404.1545; <u>see</u> <u>Cooper v.</u>
<u>Sullivan</u>, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1  Drouin, 966 F.2d at 1257.

2         B.    The ALJ's Application of the Five-Step Process

3         At step one, the ALJ found that Plaintiff had not engaged in

4  substantial gainful activity since February 9, 2006, the alleged

5  onset date.  (AR 21.)  At step two, she concluded that Plaintiff

6  had the severe impairments of "status post multiple left-sided

7  rib fractures, C7 and T1 fractures without evidence of nerve root

8  avulsion, Type II diabetes mellitus, and probable left brachial

9  plexus stretch injury."  (Id.)  At step three, the ALJ determined

10 that Plaintiff's impairments did not meet or equal any of the

11 impairments in the Listing.  (AR 23.)  At step four, she found

12 that Plaintiff had the RFC to perform light work except that he

13 was "precluded from overhead reaching with the nondominant left

14 upper extremity or lifting more than 5 pounds with the left upper

15 extremity."  (Id.)  Based on the VE's testimony, the ALJ

16 concluded that Plaintiff could perform his past work as a

17 "driver/chauffeur"; in the alternative, she found in step five

18 that Plaintiff could perform a light-level job that existed in

19 significant numbers in the national economy: gate guard, DOT

20 372.667-030, 1991 WL 673099.  (AR 25-26.)  Accordingly, she found

21 Plaintiff not disabled.  (AR 26.)

22 **V.   DISCUSSION**

23        Plaintiff contends that the ALJ erred in (1) assessing the

24 findings of his treating physician and of the nonexamining state-

25 agency physicians, (2) finding that he could perform his past

26 relevant work as actually performed, and (3) finding that the

27 VE's testimony regarding other work was consistent with the

28 Dictionary of Occupational Titles ("DOT").  (J. Stip. at 3.)  For

1  the reasons discussed below, remand is not warranted.

2       A.    The ALJ Properly Assessed the Medical Findings and

3             Opinion Evidence

4       Plaintiff claims that the ALJ erred in assessing the

5  findings of Dr. David Frecker, his treating neurologist, and the

6  opinions of Drs. J. Bradus and A. Ahmed, the nonexamining state-

7  agency physicians.  (J. Stip. at 4-7, 13-14.)

8            1.   Relevant background

9       In February 2006, Plaintiff was involved in an all-terrain-

10  vehicle accident.  (AR 23.)  He fell 160 feet off a cliff and

11  sustained major orthopedic injuries from the impact.  (Id.)   He

12  was not found until two days later, and he was airlifted to

13  Goleta Valley Cottage Hospital and then transferred to Santa

14  Barbara Cottage Hospital for specialized care.  (AR 22; see also

15  AR 252-53.)

16       Dr. David Frecker, a neurologist, treated Plaintiff after he

17  was discharged from the hospital.  (AR 22, 263-64.)  He first saw

18  Plaintiff on March 8, 2006.  (AR 263.)  He noted that extensive

19  imaging was performed in February, which showed left-rib

20  fractures, a pneumothorax,[2] and transverse-process[3] fractures at

21  C-7 and T-1.[4]  (Id.)  He noted that the loss of sensation and

22

23       [2] A pneumothorax is a collapsed lung.  See Collapsed lung
    (Pneumothorax), MedlinePlus, http://www.nlm.nih.gov/medlineplus/
24  ency/article/000087.htm (last updated July 20, 2013).

25       [3] Transverse processes are bony protrusions on either side
    of the arch of the vertebrae.  Stedman's Medical Dictionary 1450
26  (27th ed. 2000).

27
         [4] Within the spinal column are seven cervical vertebrae (C1
28  to C7), 12 thoracic vertebrae (T1 to T12), and five lumbar

weakness in Plaintiff's left arm had "improved over the last several days." (Id.)  Indeed, he noted that "nothing [had] worsened in the last few weeks, and only improvement ha[d] happened." (Id.)  Plaintiff complained of pain and weakness in his left hand but did not believe his left upper arm was weak. (Id.)  On examining Plaintiff, Dr. Frecker observed "dense sensory loss in the ulnar side of the hand radiating up into the forearm." (Id.)  Dr. Frecker diagnosed "probable left brachial plexus stretch injury[5] on the left" and recommended further imaging. (AR 264; see also AR 255-56 (spine MRI performed Mar. 9, 2006), 257-58 (spine MRI performed Mar. 8, 2006).)

On March 13, 2006, Dr. Frecker noted that Plaintiff had "improved modestly," increasing "at least 10 to 15 percent" in his strength, but he had "more burning pain" in his left arm. (AR 262.)  An MRI scan performed that day showed a "small hematoma in the region of the inferior plexus." (Id.; see also AR 254.)

On April 24, 2006, Dr. Frecker reported "improvement" in sensation and movement in Plaintiff's left hand, but movement in

---

vertebrae (L1 to L5). Spinal Cord Injury (SCI): Fact Sheet, Centers for Disease Control and Prevention, http://www.nlm.nih. gov/medlineplus/tutorials/spinalcordinjury/nr259105.pdf (last updated Nov. 4, 2010).

[5] The brachial plexus is a network of nerves that conduct signals from the spine to the shoulder, arm, and hand. Brachial Plexus Injuries, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ brachialplexusinjuries.html (last updated Apr. 23, 2014). Brachial plexus injuries are caused by damage to those nerves. Id.

1   his left arm was painful.  (AR 261.)  He prescribed Pamelor.[6]

2   (Id.)

3       On May 15, 2006, Dr. Frecker noted that Plaintiff was "doing

4   so much better" except for a "near fall," which caused him to

5   stretch his left chest and shoulder.  (AR 260.)  He stated that

6   Plaintiff was "clearly gaining a lot more strength over time" in

7   his left arm, and Dr. Frecker noted that Plaintiff's prognosis

8   was "excellent."  (Id.)  He noted that Plaintiff had problems

9   with Pamelor and recommended that he take Percocet for his pain

10  instead.  (Id.)

11      On November 16, 2006, Dr. Frecker wrote that Plaintiff was

12  "generally doing much better," noting that his arm was "moving

13  better in almost all respects," although his "[g]rip [was] still

14  weak" and he "still ha[d] some difficulty moving around his

15  shoulder."  (AR 259.)  He recommended that Plaintiff continue on

16  Percocet, which "definitely does help."  (Id.)  In late 2006,

17  Plaintiff reported that he "will not be seeing Dr. Frecker

18  anymore."  (AR 295.)  Although he apparently said he was now

19  seeing a Dr. Romero (id.), the record contains no treatment notes

20  from any such doctor.

21      On March 9, 2012, after apparently not having seen Plaintiff

22  for more than five years, Dr. Frecker completed a form entitled

23  "Medical Source Statement (Physical)," answering questions

24  regarding Plaintiff's allegedly "current limitations."  (AR 324.)

25

26      [6] Pamelor is used primarily to treat depression, but it can

27  also be prescribed to treat nerve pain.  Pamelor, WebMD,
    http://www.webmd.com/drugs/2/drug-1820/pamelor-oral/details (last

28  visited Jan. 7, 2015).

He diagnosed Plaintiff with severe brachial plexus injury. (Id.)
He then checked boxes indicating that Plaintiff was able to (1)
occasionally lift, carry, or upward pull less than 10 pounds; (2)
frequently lift, carry, or upward pull less than 10 pounds; (3)
stand or walk with normal breaks for about six hours in an eight-
hour day; (4) sit continuously with normal breaks for about six
hours in an eight-hour day; and (5) push or pull with severe
limitations in his left upper extremity. (Id.) He indicated
that the limitations had existed "[s]ince 2/06." (Id.) He did
not write any response to the question, "How many hours per month
would the above limitations likely disrupt a regular job schedule
with low physical demands?" (Id.) Nor did he indicate that the
lifting restrictions applied only to Plaintiff's left hand.
(Id.)

Although Plaintiff visited an urgent-care facility several
times from March 2007 to August 2009, he apparently never
complained of arm, chest, or neck pain. (See AR 273-89.)
Rather, his complaints concerned feet tingling, rosacea,
insomnia, vision problems, asthma, and poison oak. (Id.) The
records also indicate that he regularly failed to follow up with
recommended treatment or referrals. (Id.)

Dr. J. Bradus, a nonexamining state physician, reviewed
Plaintiff's medical records and prepared a case analysis dated
December 15, 2009.[7] (AR 307-10.) Dr. Bradus noted that the

---

[7] Dr. Bradus's electronic signature includes a medical
specialty code of 32, indicating pediatrics. (AR 310); see
Program Operations Manual System (POMS) DI 26510.089, U.S. Soc.
Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/
0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29,

medical records "received for the time period between 02/09/2006 and 06/30/2006 [did] not include a physical exam and [were] not sufficient to make a determination of disability." (AR 309.) She noted that as of June 2006, Plaintiff's left upper-extremity weakness had improved, but he "still had limited [range of motion] and some pain." (AR 310.) Plaintiff's "[p]rognosis was considered to be good." (Id.) She stated, "It seems likely that [Plaintiff] was limited to one armed work as of [date last insured] of 6/06, and subsequent exams do not show worsening, however there are no good exams in file and therefore there is insuff[icient] evidence to assess this claim as of . . . 6/06." (Id.)

On reconsideration, another nonexamining state physician, Dr. A. Ahmed, reviewed Plaintiff's medical records.[8] (AR 322-23.) In his case analysis, dated March 18, 2010, Dr. Ahmed stated,

> At [reconsideration] the [Plaintiff] reports no worsening, no new limitations, no new conditions and no new medical sources. There is no additional [medical evidence of record] to review.

(AR 322.) Dr. Ahmed recommended that the denial of benefits be affirmed based on insufficient evidence. (AR 323.)

---

2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

[8] Dr. Ahmed's electronic signature includes a medical specialty code of 45, indicating surgery. (AR 323); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), http://policy.ssa.gov/poms.nsf/lnx/0426510090.

1          2.   Applicable law

2          Three types of physicians may offer opinions in Social

3     Security cases: (1) those who directly treated the plaintiff, (2)

4     those who examined but did not treat the plaintiff, and (3) those

5     who did not treat or examine the plaintiff.  Lester, 81 F.3d at

6     830.  A treating physician's opinion is generally entitled to

7     more weight than that of an examining physician, and an examining

8     physician's opinion is generally entitled to more weight than

9     that of a nonexamining physician.  Id.

10         This is true because treating physicians are employed to

11    cure and have a greater opportunity to know and observe the

12    claimant.  Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

13    If a treating physician's opinion is well supported by medically

14    acceptable clinical and laboratory diagnostic techniques and is

15    not inconsistent with the other substantial evidence in the

16    record, it should be given controlling weight.  § 404.1527(c)(2).

17    If a treating physician's opinion is not given controlling

18    weight, its weight is determined by length of the treatment

19    relationship, frequency of examination, nature and extent of the

20    treatment relationship, amount of evidence supporting the

21    opinion, consistency with the record as a whole, the doctor's

22    area of specialization, and other factors.  § 404.1527(c)(2)-(6).

23         When a treating or examining physician's opinion is not

24    contradicted by other evidence in the record, it may be rejected

25    only for "clear and convincing" reasons.  See Carmickle v.

26    Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008)

27    (quoting Lester, 81 F.3d at 830-31).  When a treating or

28    examining physician's opinion is contradicted, the ALJ must

11

provide only "specific and legitimate reasons" for discounting

it.  Id.  The weight given an examining physician's opinion,

moreover, depends on whether it is consistent with the record and

accompanied by adequate explanation, among other things.

§ 404.1527(c)(3)-(6).

Furthermore, "[t]he ALJ need not accept the opinion of any

physician, including a treating physician, if that opinion is

brief, conclusory, and inadequately supported by clinical

findings."  Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir.

2002); accord Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d

1190, 1195 (9th Cir. 2004).

### 3.   Analysis

In determining Plaintiff's RFC, the ALJ rejected Dr.

Frecker's March 2012 functional capacity assessment "due to the

lack of medical support."  (AR 24.)  Specifically, the ALJ noted

that Dr. Frecker's assessment was "not consistent with his

optimistic reports both before and after the alleged onset date."

(Id.)  Indeed, as the ALJ noted, "Dr. Frecker repeatedly stated

the claimant had significant orthopedic improvement in the months

following his injuries."  (Id.; see, e.g., AR 260 (on May 15,

2006, indicating "excellent" prognosis, with Plaintiff "doing so

much better" and "clearly gaining a lot more strength"), 261 (on

Apr. 24, 2006, noting improvement in sensation and movement in

left hand, although painful), 262 (on Mar. 13, 2006, noting

modest improvement and increased strength but "more burning

pain"), 263 (on Mar. 8, 2006, noting "only improvement" in weeks

since accident).)  By November 16, 2006, five months after

Plaintiff's date last insured, Plaintiff was "generally doing

much better" and his arm was "moving better in almost all respects," although his "[g]rip [was] still weak" and he "still ha[d] some difficulty moving around his shoulder." (AR 259.) Pain medication "definitely" helped Plaintiff. (Id.) Because Dr. Frecker's treatment notes from March 2006 to November 2006 contradicted his March 2012 functional assessment — which he wrote after apparently not having seen Plaintiff for more than five years — the ALJ was required to give only specific and legitimate reasons for discounting the latter. See Carmickle, 533 F.3d at 1164. This he did.

As the ALJ noted, "Dr. Frecker's March 2012 functional capacity assessment was not supported by any discussion of objective medical findings or his rationale for restricting the claimant to a limited range of sedentary work." (AR 24.) Dr. Frecker's opinion consisted mainly of checked-off boxes, and he did not write any response to the question, "How many hours per month would the above limitations likely disrupt a regular job schedule with low physical demands?" (AR 324.) Moreover, he did not limit his lifting restrictions to the left arm. (See id.) Thus, the ALJ properly rejected Dr. Frecker's opinion as conclusory and inadequately supported. Thomas, 278 F.3d at 957; see also Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir. 2012) (ALJ may "permissibly reject" "check-off reports that [do] not contain any explanation of the bases of their conclusions" (internal quotation marks omitted)).

The ALJ also properly discounted Dr. Frecker's findings because Drs. Bradus and Ahmed, the nonexamining state physicians, "both concluded that there was insufficient evidence of a

disabling physical or mental impairment prior to the date last insured." (AR 24-25.) Indeed, Plaintiff apparently sought no treatment after 2006 for his chest and arm pain. Dr. Bradus noted Plaintiff's good prognosis and improvement in his left upper-extremity weakness. (AR 310.) He also noted that exams after June 2006 did not show worsening. (Id.) Dr. Ahmed noted in March 2010 that Plaintiff "report[ed] no worsening, no new limitations, [and] no new conditions." (AR 322.) Thus, the ALJ properly rejected Dr. Frecker's assessment as inadequately supported.

Plaintiff argues that the ALJ erroneously rejected the opinions of Drs. Bradus and Ahmed in determining he was not disabled. (J. Stip. at 6-7.) But the ALJ did not reject the state physicians' opinions; she cited their opinions as a reason for discounting Dr. Frecker's functional assessment and to determine the weight to give to it. See § 404.1527(c)(4) (ALJ may determine weight to give treating physician's opinion based on its consistency with record as whole).

Plaintiff is not entitled to remand on this ground.

B.  Any Error in the ALJ's Determination that Plaintiff
     Could Perform His Past Relevant Work Was Harmless

Plaintiff contends that the ALJ erred in finding that he could perform his past relevant work because (1) there was no testimony on how he performed his past work and (2) the VE testified only that Plaintiff could perform "portions" of his past work, not that he could perform it as a whole. (J. Stip. at 14-19, 21-28.)

1

         1.   <u>Relevant background</u>

2      In a disability report, Plaintiff described two previous

3 jobs. (AR 210.)  His longest held job, from 1990 to 2001, was as

4 a personal assistant and property manager, at which he worked 11

5 hours a day six days a week. (<u>Id.</u>)  He also worked as a handyman

6 from 2002 to 2006, the onset date. (<u>Id.</u>)

7      At the hearing, the VE interpreted Plaintiff's past job as a

8 personal assistant and property manager to be a combination of

9 three DOT positions: (1) chauffeur, DOT 913.463-018, 1991 WL

10 687825, (2) household manager, DOT 301.137-010, 1991 WL 672650,

11 and (3) bodyguard, DOT 372.667-014, 1991 WL 673095. (AR 112,

12 115-16.)  She testified that the DOT classified the chauffeur job

13 at the medium-exertion level but that Plaintiff had performed it

14 at the light-exertion level, based on his statement that he never

15 lifted more than 20 pounds. (AR 116.)  The DOT classified the

16 household-manager and bodyguard jobs at the light-exertion level.

17 (<u>Id.</u>)

18      The VE further testified, in response to the ALJ's first

19 hypothetical, that a person who could use his nondominant, left

20 upper extremity for assistance only and had no limitations with

21 his dominant, right upper extremity could perform the past jobs.

22 (<u>Id.</u>)  When the ALJ refined the hypothetical to exclude overhead

23 reaching and lifting greater than five pounds with the left upper

24 extremity — the same limitations ultimately included in the RFC —

25 the VE testified that the person would be able to perform the

26 chauffeur and bodyguard "portions" of the job as Plaintiff

27 performed it but not the household-manager portion:

28      I do not think he could do the job as performed.  He

1    could do the chauffeur and body guard portions of it.  As
2        the house manager, the record indicates that he assisted
3        moving things, such as cases of wine.

4  (AR 117.)  The ALJ followed up by asking, "So all of the --
5  however we look at the past job, he would be precluded?," to
6  which the VE replied, "Yes, he would be --," and then the ALJ cut
7  her off by asking another question.  (Id.)

8        Based on the VE's testimony, the ALJ found that work as a
9  chauffeur was medium, semiskilled work as generally performed in
10 the national economy but was light, semiskilled work as Plaintiff
11 had performed it.  (AR 25.)  She concluded at step four that
12 Plaintiff could perform his past work of "driver/chauffeur" as
13 actually performed.  (Id.)  She noted that this conclusion was
14 "consistent with the credible testimony of the vocational expert
15 at the hearing."  (Id.)  She therefore found Plaintiff not
16 disabled.  (AR 26.)

17            2.  Applicable law

18       At step four of the five-step disability analysis, a
19 claimant has the burden of proving that he cannot return to his
20 past relevant work, as either actually or generally performed in
21 the national economy.  Pinto v. Massanari, 249 F.3d 840, 844-45
22 (9th Cir. 2001); § 404.1520(e).  Past relevant work is work the
23 claimant performed within the preceding 15 years that was
24 "substantial gainful activity" and lasted long enough for the
25 claimant to learn to do it.  § 404.1560(b)(1).  "Substantial
26 gainful activity" is work activity done for pay or profit
27 involving significant physical or mental activities; it may be
28 substantial "even if it is done on a part-time basis."

§ 404.1572.

Although the burden of proof lies with the claimant at step four, the ALJ still has a duty to make factual findings to support her conclusion. <u>Pinto</u>, 249 F.3d at 844. The ALJ can meet this burden by comparing the physical and mental demands of the past relevant work with the claimant's actual RFC. <u>Id.</u> at 844-45; § 404.1520(f). When a job is a "composite" – that is, it has significant elements of two or more occupations and therefore has no counterpart in the DOT – the ALJ considers only whether the claimant can perform his past relevant work as actually performed. <u>See</u> Program Operations Manual System (POMS) DI 25005.020(B), <u>available at</u> http://policy.ssa.gov/poms.nsf/lnx/0425005020.

To ascertain the requirements of occupations as generally performed in the national economy, the ALJ may rely on information from the DOT or VE testimony. <u>Pinto</u>, 249 F.3d at 845-46; SSR 00-4P, 2000 WL 1898704, at *2 (Dec. 4, 2000) (at steps four and five, SSA relies "primarily" on DOT "for information about the requirements of work in the national economy" and "may also use VEs . . . at these steps to resolve complex vocational issues"); SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982) ("The [DOT] descriptions can be relied upon — for jobs that are listed in the DOT — to define the job as it is <u>usually</u> performed in the national economy." (emphasis in original)). Because "[t]he DOT contains information about most, but not all, occupations," information about a particular job's requirements or about occupations not listed in the DOT may be found in other sources. SSR 00-4P, 2000 WL 1898704, at *2; <u>see</u>

also <u>Johnson v. Shalala</u>, 60 F.3d 1428, 1435 (9th Cir. 1995) (DOT is not sole source of information about jobs and itself states that it is not comprehensive).

### 3. <u>Analysis</u>

The VE testified that Plaintiff's past relevant work was described by a combination of three DOT titles: chauffeur, bodyguard, and household manager, all of which were "light level" jobs as either generally or actually performed. (AR 115-16.) There was apparently not one DOT title that fully captured Plaintiff's past "personal assistant, property manager" position. Plaintiff testified that in that job, he drove to Los Angeles from Santa Barbara (and presumably back again) "almost every day," for a total of about 65,000 miles a year. (AR 112.) Plaintiff also stated in his application that he did not lift more than 20 pounds in that job (AR 211), which the VE relied upon in making her findings (AR 118). The ALJ found that Plaintiff had past relevant work as a "driver/chauffeur" and concluded that he could perform that work as actually performed, at the light exertion level. (AR 25.) The ALJ based her finding on the VE's opinion that a hypothetical individual could work as a chauffeur as Plaintiff performed that past work even with restrictions on overhead reaching and lifting with the left upper extremity. (AR 117.)

<u>Valencia v. Heckler</u>, 751 F.2d 1082, 1085-87 (9th Cir. 1985), relied upon by Plaintiff (J. Stip. at 19), is not contrary to the ALJ's finding. In that case, the Ninth Circuit held that the Appeals Council erred in classifying the claimant's past work as a kitchen helper and agricultural laborer as "light" based on the

18

demands of one of the tasks she performed, tomato sorting. <u>Id.</u> at 1085-86. The VE and the ALJ had both found that the Plaintiff's past work was in the DOT and categorized as "medium" grade. <u>Id.</u> Thus, it was error for the Appeals Council to excise one isolated task from that work, which was only light exertion, and categorize that as Plaintiff's past relevant work. <u>Id.</u> at 1086-87. Here, in contrast, the VE did not identify a single job in the DOT as encompassing Plaintiff's past relevant work. <u>See</u> SSR 00-4P, 2000 WL 1898704, at *2; <u>Johnson</u>, 60 F.3d at 1435. Nor did the ALJ identify as Plaintiff's past relevant work a job at a greater exertional level than the RFC. Finally, Plaintiff's former duties as a driver/chauffeur can hardly be characterized as just a small part of his former work based on his testimony that he drove to Los Angeles nearly every day, for a total of 65,000 miles a year.[9] It is clear that driving was by far the dominant part of Plaintiff's job. (<u>See also</u> AR 112 (VE testifying, "I didn't realize you did so much driving.").) Indeed, given Plaintiff's statement that he worked 11 hours a day six days a week (AR 210), the driving/chauffeur portion of his job likely filled a regular work schedule. <u>Compare</u> <u>Druckerman v. Colvin</u>, No. EDCV 13-01836-JEM, 2014 WL 5089398, at *7 (C.D. Cal. Oct. 9, 2014) (affirming ALJ's determination that claimant could perform past work as described in one DOT occupation even though work was "composite or hybrid job with significant elements of two occupations" because ALJ did not "parse out or exclude"

---

[9] If Plaintiff worked five days a week 50 weeks of the year, he would have had to drive 260 miles a day to reach 65,000 in a year.

significant functions), with Melendez v. Colvin, No. CV
14-719-PLA, 2014 WL 6630013, at *4 (C.D. Cal. Nov. 21, 2014)
(remanding in part because at step four ALJ "isolate[d] a
specific task from the myriad of tasks" Plaintiff had performed
in past composite job).

Moreover, even if the ALJ did err, the error was harmless
because the ALJ alternatively found at step five that Plaintiff
could perform another job at the light exertional level: gate
guard.[10]  (AR 25-26); see Tommasetti v. Astrue, 533 F.3d 1035,
1042 (9th Cir. 2008) (finding step-four error harmless in light
of ALJ's alternative step-five finding).  Thus, any error was
harmless.

Plaintiff is not entitled to remand on this ground.

C.   The ALJ Properly Found that the Vocational Expert's
     Testimony Was Consistent with the DOT

Plaintiff challenges the ALJ's alternative finding at step
five that he could perform other work existing in significant
numbers in the national economy.  Specifically, Plaintiff
contends that the ALJ erred in finding that the VE's testimony on
gate guards was consistent with the DOT.  (J. Stip. at 22-28, 30-
31.)

1.   Relevant background

At the hearing, after the VE opined that Plaintiff would not
be able to perform the household-manager portion of his past
relevant work, the ALJ asked her if Plaintiff had any

_____

[10] Plaintiff also contends that the ALJ's step-five
determination was erroneous.  As discussed infra Section V.C, it
was not.

transferable skills.  (AR 117.)  The VE stated that Plaintiff had transferable skills from his work as a chauffeur and bodyguard — namely, knowledge of security procedures, "escorting," "working with people in a security position," "having a former history of carrying a weapon," "having been bonded," "dealing with people," "speak[ing] to the public," "screening people," "exercising sound judgment," and "serving customers."  (AR 118, 120.)

The VE stated that such skills would transfer into a gate-guard job, classified as light, semiskilled work, DOT 372.667-030, 1991 WL 673099.  (AR 118.)  When asked whether her opinions were consistent with the DOT and "other vocational resources," she answered yes.  (Id.)

Plaintiff's counsel asked the VE whether a gate guard had to move gates.  (AR 119.)  She answered, "Typically not."  (Id.) When asked to clarify her answer, she said, "I have never seen a person have to move gates in the positions that I refer to when I cite this position."  (Id.)  Plaintiff's counsel then asked whether gate guards needed to keep records.  (Id.)  The VE stated, "I don't believe they do."  (Id.)  She also added, "I've not seen them keep records."  (AR 119-20.)

In her decision, the ALJ wrote, "Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupation Titles."  (AR 26.)

According to the DOT, a gate guard has the following responsibilities:

Guards entrance gate of industrial plant and grounds, warehouse, or other property to control traffic to and

from buildings and grounds: Opens gate to allow entrance or exit of employees, truckers, and authorized visitors. Checks credentials or approved roster before admitting anyone.   Issues passes at own discretion or on instructions from superiors.   Directs visitors and truckers to various parts of grounds or buildings. Inspects outgoing traffic to prevent unauthorized removal of company property or products.  May record number of trucks or other carriers entering and leaving.   May perform maintenance duties, such as mowing lawns and sweeping gate areas.  May require permits from employees for tools or materials taken from premises.   May supervise use of time clocks for recording arrival and departure of employees [TIMEKEEPER (clerical) 215.362-022].  May answer telephone and transfer calls when switchboard is closed. . . .

DOT 372.667-030, 1991 WL 673099.

      2. <u>Applicable law</u>

At step five of the five-step process, the Commissioner has the burden to demonstrate that the claimant can perform some work that exists in "significant numbers" in the national or regional economy, taking into account the claimant's RFC, age, education, and work experience. <u>Tackett v. Apfel</u>, 180 F.3d 1094, 1100 (9th Cir. 1999); 42 U.S.C. § 423(d)(2)(A); 20 C.F.R. § 404.1560(c). The Commissioner may satisfy that burden either through the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2.  <u>Tackett</u>, 180 F.3d at 1100-01; <u>see also</u> <u>Hill v.</u>

1   <u>Astrue</u>, 698 F.3d 1153, 1161 (9th Cir. 2012).  When a VE provides

2   evidence about the requirements of a job, the ALJ has a

3   responsibility to ask about "any possible conflict" between that

4   evidence and the DOT.  <u>See</u> SSR 00-4p, 2000 WL 1898704, at *4;

5   <u>Massachi v. Astrue</u>, 486 F.3d 1149, 1152-54 (9th Cir. 2007)

6   (holding that application of SSR 00-4p is mandatory).  When such

7   a conflict exists, the ALJ may accept vocational expert testimony

8   that contradicts the DOT only if the record contains "'persuasive

9   evidence to support the deviation.'"  <u>Pinto</u>, 249 F.3d at 846

10  (quoting <u>Johnson</u>, 60 F.3d at 1435); <u>see also</u> <u>Tommasetti</u>, 533 F.3d

11  at 1042 (finding error when "ALJ did not identify what aspect of

12  the VE's experience warranted deviation from the DOT").

13          3.  <u>Analysis</u>

14      Here, the ALJ properly inquired and the VE confirmed that

15  her testimony was consistent with the DOT.  (AR 118.)  According

16  to the DOT, a gate guard "[o]pens gate[s]."  DOT 372.667-030,

17  1991 WL 673099.  Plaintiff's counsel asked the VE whether a gate

18  guard had to "move gates."  (AR 119.)  The VE's response — that

19  based on her expertise a gate guard would "[t]ypically not" have

20  to move gates — was consistent with the DOT to the extent that a

21  gate could be opened without moving it physically, for example,

22  by pressing a button or flipping a switch.  (<u>Id.</u>)

23      Plaintiff argues that the ALJ erroneously relied on the VE's

24  testimony regarding gate-guard work because he could not

25  "apprehend[]" or "apply hand cuffs" on a "suspect."  (J. Stip. at

26  27.)  But nothing in the DOT's description suggests that among a

27  gate guard's duties is to apprehend, detain, or handcuff

28  individuals.  <u>See</u> DOT 372.667-030, 1991 WL 673099.  Also

23

unavailing is Plaintiff's conclusory statement that he could not "do the mowing and sweeping required" with an upper-extremity limitation (J. Stip. at 27) because the DOT states only that gate guards "may" perform tasks like "mowing lawns and sweeping gate areas," DOT 372.667-030, 1991 WL 673099.  See Garcia v. Astrue, No. 1:11-cv-2037-BAM, 2013 WL 978250, at *7 (E.D. Cal. Mar. 12, 2013) (finding no conflict between DOT and VE's testimony because DOT indicated that worker "may" perform certain task).  Moreover, Plaintiff's RFC might not have prevented him from performing those activities, as he was precluded only from performing overhead reaching and lifting more than five pounds with his left arm and had no limitation on the use of his right arm.

Plaintiff argues that because the ALJ did not include household manager and bodyguard as his past relevant work, she was precluded from considering transferable skills from those positions.  (J. Stip. at 27.)  He cites no law in support of his contention.  Moreover, the ALJ never stated that Plaintiff's only past relevant work was as a driver/chauffeur; she merely stated that Plaintiff could perform that past relevant work.  (AR 25.) Indeed, the VE, upon whose testimony the ALJ expressly relied, testified that Plaintiff had "past relevant work . . . as personal assistant, property manager" and recognized that that work incorporated the chauffeur and bodyguard positions.  (AR 116.)  As discussed above, the VE's testimony was consistent with the DOT, and the ALJ was entitled to rely on it.  Because the ALJ's hypothetical to the VE specified that the individual had the "same past work experience" as Plaintiff (id.) and the VE testified that Plaintiff's past work was classified under three

24

1 DOT titles (AR 115-16), the ALJ properly considered transferable

2 skills from Plaintiff's past job as a bodyguard.

3     Plaintiff is not entitled to remand on this ground.

4 **VI.   CONCLUSION**

5     Consistent with the foregoing, and pursuant to sentence four

6 of 42 U.S.C. § 405(g),[11] IT IS ORDERED that judgment be entered

7 AFFIRMING the decision of the Commissioner, DENYING Plaintiff's

8 request for reversal of the Commissioner's decision, and

9 DISMISSING this action with prejudice.   IT IS FURTHER ORDERED

10 that the Clerk serve copies of this Order and the Judgment on

11 counsel for both parties.

12

13 DATED: January 13, 2015

14                         JEAN ROSENBLUTH
                        U.S. Magistrate Judge

15

16

17

18

19

20

21

22

23

24

25

---

26    [11] This sentence provides: "The [district] court shall have
power to enter, upon the pleadings and transcript of the record,

27 a judgment affirming, modifying, or reversing the decision of the
Commissioner of Social Security, with or without remanding the

28 cause for a rehearing."